IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| JILL LINETTE BACON | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ. No. 12-1477-GMS |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of | ) | |
| Social Security, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM

Plaintiff Jill Linette Bacon ("Bacon") appeals from a decision of defendant Carolyn W. Colvin, Acting Commissioner of Social Security ("Commissioner"), denying her application for supplemental social security income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. § 1381–1383f. The court has jurisdiction over the matter pursuant to 42 U.S.C. § 405(g).

Presently before the court are the parties' cross-motions for summary judgment. (D.I. 14, 17). Bacon asks the court to reverse the Commissioner's decision and order benefits or remand for further proceedings. (D.I. 15 at 19). The Commissioner opposes this motion and requests that the court affirm her decision. (D.I. 18 at 21). For the reasons set forth below, Bacon's motion for summary judgment will be DENIED and the Commissioner's motion for summary judgment will be GRANTED.

1

I.  **BACKGROUND**

A.  **Procedural History**

Bacon filed an application for SSI on December 14, 2009, alleging disability beginning April 1, 2003. (Tr. 148-155). Bacon's application was denied initially on February 22, 2010 and upon reconsideration on May 7, 2010. (Tr. 80-88). Bacon requested a hearing before an Administrative Law Judge ("ALJ") which was held on May 6, 2011. (Tr. 29-75). On June 3, 2011, the ALJ issued an unfavorable decision. (Tr. 6-22). On September 12, 2012, the Appeals Council denied Bacon's request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 1-4). On November 15, 2012, Bacon filed a complaint in this court seeking judicial review of the ALJ's decision. (D.I. 1).

B.  **Medical History**

Bacon was born in 1976. (Tr. 36). She was 33 years old at the alleged onset date of April 1, 2003. In her application, Bacon alleged disability due to back problems, Scheuermann's kyphosis, scoliosis, depression, anxiety, high blood pressure, sleep apnea, and high cholesterol. (Tr. 196). Bacon has a high school degree and worked in the past as a cashier/stock person at a gas station, flagger, school bus driver, and hostess. (Tr. 70-71, 197). Bacon reported that she stopped working in 2003.[1] (Tr. 493). Following is Bacon's medical history with respect to those impairments at issue in this appeal.

---

[1] The reason Bacon stopped working as a manager at a gas station in 2003 is unclear. She reported to her spinal and neuro surgeon that she stopped working due to pack pain. (Tr. 493). In an evaluation with a consultant psychologist for DDS, she reported that she stopped working because she had problems concentrating and could not express herself very well. (Tr. 287). In a second evaluation almost two years later, she told the same psychologist that she stopped working because she was fired over a pay dispute. (Tr. 455). Finally, at the hearing before the ALJ, Bacon testified that she stopped working because she was having problems lifting. (Tr. 39).

2

### 1. April 2008 Car Accident

On April 22, 2008, Bacon was in a car accident. (Tr. 260). Bacon reported that her full-size car was hit in the rear by a mid-size car while she was stopped for construction on a dry road. (Tr. 362). She was wearing her seatbelt. (*Id.*). Her airbag did not deploy, her seat did not break, she did not lose consciousness, and following the accident she went home. (*Id.*). She reported that she later went to Glasgow Medical Center for neck pain. (Tr. 493).

### 2. X-rays and Imaging of the Back

From 2008 to 2010, Bacon obtained various x-rays, a bone scan, and MRIs in connection with treatment of her back pain. An x-ray from April 24, 2008 showed that the lumbar spine was within normal limits and degenerative changes were present in the lower thoracic spine. (Tr. 278). An x-ray performed at Dr. Rowe's office on May 5, 2008 noted "significant" degenerative disk disease at C4-C5 with loss of lordotic curve, but no evidence of fracture. (Tr. 337). A bone scan of Bacon's whole body dated May 19, 2008 showed no significant findings. (Tr. 339).

Bacon had imaging of her back each year from May 2008 to May 2010 with no significant changes. An MRI of the lumbar spine dated May 29, 2008 showed mild lateral recess stenosis at L4-5 and a shallow broad-based herniation at L5-S1 that mildly impresses both S1 nerve roots. (Tr. 346). An MRI of Bacon's lumbar spine dated May 15, 2009 showed the same minimal disc bulge with no significant stenosis at L4-5 and a mild broad-based disc protrusion at L5-S1 contacting the left S1 nerve roots, and minimal bilateral foraminal narrowing at that level as well. (Tr. 499). Finally, an MRI of the lumbar spine from May 2010 revealed a minimal central disc protrusion at L4-5, and a small broad-based disc protrusion at L5-S1 contacting both descending S1 nerve roots without significant compression, and central annular fissure present at L5-S1. (Tr. 680).

The MRI of Bacon's cervical spine dated May 16, 2008 showed cervical stenosis at the C5-6 and foraminal narrowing on the right side at C3-4 due to uncinated hypertrophy. (Tr. 344). A cervical spine MRI from May 2010 showed the same mild central cord stenosis at C5-6 and ucinate hypertrophy contributing to mild right foraminal stenosis at C4-5 and C3-4. (Tr. 681).

Finally, a thoracic spine MRI from May 2010 showed a small broad-based central disc/osteophyte complex at T10-11, but no stenosis or disc extrusion at any level. (Tr. 679). It also demonstrated mild kyphosis and small Schmorl's nodules at multiple levels consistent with Bacon's history of Scheuermann's disease. (*Id.*).

### 3. Doctor's Treatments and Evaluations for Back and Neck Pain

From 2008 to 2010, Bacon sought treatment from numerous doctors for her back and neck pain. Their findings and treatment options were relatively consistent, but Bacon reported that none provided complete relief. Following is an overview of her treatment in relatively chronological order.

From May 2008 until March 2009, Bacon sought treatment from Glen D. Rowe, D.O., an orthopedic surgeon for pain in the neck, shoulder, and back. He consistently diagnosed longstanding degenerative changes of lumbar spine and cervical strain post motor vehicle accident. (Tr. 331-335). Dr. Rowe prescribed Motrin as an anti-inflammatory and recommended light stretching and a heating pad. (Tr. 337). Dr. Rowe also recommended physical therapy for the lumbar spine and suggested she see someone for pain management and possible epidural injections. (Tr. 332, 333, 334).

From June 2008 to November 2009, Bacon saw her primary care physician, Muhammed Niaz, M.D., at Tri-State Health, Inc., on an approximately monthly basis to address the pain in her neck and back. (Tr. 382-402, 533-48). A physical examination by Dr. Niaz in June 2008 revealed

4

that movements in the neck and left hand were painful and limited. (Tr. 261). Thereafter, Dr. Niaz consistently diagnosed backache and continued to recommend physical therapy and prescribe anti-inflammatory and pain medications. (Tr. 261, 382-411, 533-48).

In September 2008, Richard A. Fischer, M.D., completed a neurological evaluation to evaluate Bacon's complaints of neck pain. His clinical summary was that Bacon showed mild thumb abduction weakness, but otherwise upper extremity strength was normal and there was no sensory deficit. (Tr. 363).

On referral from Dr. Niaz, Bacon periodically received nerve block injections from Dr. Downing, a specialist in pain medicine at Interventional Spine Pain Consultants. (Tr. 439). Two injections of the lumber spine were performed in October 2008, and another two injections around October 2009. (Tr. 429-31, 434, 438). Bacon reported minimal change following the lumbar injections, and lumbar pain during range of motion tests and palpation. (Tr. 426, 431). Dr. Downing observed that Bacon had a coordinated gait without assistance, 5/5 lower extremity strength, and intact sensation. (Tr. 431). He diagnosed lumbar radiculopathy and lumbar spondylosis. (Tr. 426, 429-31). In addition to the injections, Dr. Downing recommended physical therapy or chiropractic treatment. (Tr. 427, 440-41).

Between October 2008 and December 2008, Bacon attended five physical therapy treatments with Christiana Care Plus, less than the 12 to 18 appointments recommended. (Tr. 551). The stated goal of physical therapy was to decrease neck pain. (*Id.*). There is no record that Bacon sought or received physical therapy for her back. At each appointment, Bacon reported an 8/10 pain in her neck every day. (*Id.*). The discharge papers state that the patient stopped physical therapy on her own. (*Id.*).

Bacon received chiropractic treatment from Trent Camp, D.C., C.C.R.D., at 4 routine office visits during 1 week in February 2009. (Tr. 359-361). Dr. Camp observed severe spasm and tenderness in the lumbo-sacral region and moderate to severe spasm and tenderness in the cervico-thoracic region. (Tr. 362). His primary diagnosis was cervical brachial syndrome with cervical somatic dysfunction, and his secondary diagnosis was lumbar disc herniation. (Tr. 361). Dr. Camp advised that Bacon apply cold packs at home and stressed the importance of continuing the home exercise program. (Tr. 359).

Around April and May of 2009, Bacon sought treatment from Balepur Venkataramana, M.D., a spinal and neuro surgeon, for her low back pain. (Tr. 492). Bacon reported that she was using a TENS unit and had physical therapy, but neither provided relief. A physical examination by Dr. Venkataramana revealed neck tenderness, slightly limited range of motion in the neck, very limited lumbar spine movements, but full motor strength, and an "okay" gait. (Tr. 493). Bacon could walk on her heels and toes. (*Id.*). Dr. Venkataramana diagnosed degenerative disc disease of the lumbar spine causing retrolisthesis and facet arthritis. (*Id.*). He emphasized that, as a part of treatment, Bacon "must lose weight" and should seek nutritional counseling. (*Id.*). Because chiropractic treatment, physical therapy, and medications did not help, Dr. Venkataramana recommended a spinal fusion surgery at the L4-5 and L5-S1. (Tr. 497, 494). Surgery was scheduled for July 2009, but Bacon canceled it. (Tr. 494). Dr. Venkataramana has not seen Bacon since that time. (*Id.*).

From August 2010 to February 2011, Bacon again sought treatment from Dr. Niaz on an approximately monthly basis to address pain in her neck and lower back. Dr. Niaz consistently diagnosed neck stiffness, muscle spasms in the cervical area, lumbar spine tenderness, slight lumbar spasms, and tenderness of the sacrum, coccyx, and sacroiliac joints. (Tr. 627, 633-34, 636-

6

37, 639-40, 642-43). Her prescribed medications included Oxycodone and Xanax. (Tr. 627). Bacon consistently reported that her pain was 6/10 with medication and 10/10 without medication. (Tr. 630).

In February 2011, Bacon reported increased levels of pain at a 9/10 and 10/10 with medication. (Tr. 644-647). Physical examination revealed, in addition to the same conditions as before, tenderness in the left shoulder. (Tr. 651). Dr. Niaz adjusted Bacon's dosage of Oxycodone and added Neurontin to her medications. (Tr. 647, 649). Bacon returned to Dr. Downing in March 2011 for an injection in her left shoulder. (Tr. 686). Dr. Downing diagnosed cervical radiculopathy and myofascial dysfunction. (*Id.*). A left rhomboid trigger point injection was performed on March 16, 2011. (Tr. 688).

In April 2011, on referral from Dr. Niaz, Bacon began treatment with Jie Zhu, MD, a pain management specialist for pain in the neck and low back. (*Id.*). Bacon reported that she left Dr. Downing because she did not receive any pain relief with his procedures and that she tried physical therapy for a couple of months also without any relief. (*Id.*). She also denied having any lumbar spine MRIs. (*Id.*). Physical examination revealed tenderness in the neck and lower back. (Tr. 671). Dr. Zhu's primary diagnosis was chronic pain syndrome and radicular syndrome of the upper limbs. (Tr. 672). He discussed treatment options including pain medications, epidural steroid injections, and physical therapy. (*Id.*).

### 4.     Doctor's Treatments and Evaluations for Obesity

The Clinical Guidelines issued by The National Institutes of Health define obesity as present in general where there is a body mass index (BMI) of 30.0 or above. (Tr. 15). BMI is the ratio of an individual's weight in kilograms to the square of her height in meters. (*Id.*). Dr. Rowe reported that in March 2009, Bacon was 5'2' tall and weighed 238 pounds. (Tr. 330). Dr.

7

Venkataramana reported in May 2009 that to keep herself healthy over a long period of time, Bacon should start losing weight, at least 25 pounds. (Tr. 366). He added that it would probably take a year to achieve that, but she must. (*Id.*).

From September 2009 to December 2009, Bacon received treatment from Anthony D. Alfieri, D.O., a cardiologist, for ischemic heart disease, mixed hyperlipidemia, hypertension, and obesity. (Tr. 412). Dr. Alfieri had "extensive discussions" with Bacon regarding the value of regular exercise and weight loss. (Tr. 418, 424). Over the course of treatment, Dr. Alfieri noted that conditions regarding Bacon's obesity were "worsening, not improving," and there were compliance problems with diet, exercise program, and weight management. (Tr. 412, 416, 422).

In an appointment with Dr. Niaz on August 11, 2010, Bacon's BMI was 40.06. (Tr. 628). He again recommended she try to increase home exercise. (Tr. 629). At the hearing with the ALJ, Bacon testified that she was 230 pounds, resulting in a BMI of 42.1. (Tr. 15).

### A. Medical Opinions Regarding Bacon's Physical Impairments

#### 1. Dr. Niaz

In a "To whom it may concern" letter dated April 28, 2010, Dr. Niaz reported treating Bacon for chronic back pain, disc disorder, diabetes mellitus, and sleep apnea. (Tr. 486). He wrote that Bacon had difficulty standing more than 15 minutes and sitting more than 30 minutes. (*Id.*). He also stated that "she is not able to work for the next twelve months and I feel as though she is a candidate for disability." (*Id.*).

On July 1, 2010, Dr. Niaz completed a Spinal Impairment Questionnaire. (Tr. 506-12). He identified Bacon's diagnoses as a backache, disc disease, annular fissure, and obesity. (Tr. 506). He indicated that Bacon's lumbar spine had limited range of motion, tenderness, and spasm. (Tr. 507). The cervical spine had none of those symptoms. (*Id.*). Neither the lumbar spine nor

8

the cervical spine had sensory loss, muscle atrophy, reflex changes, or muscle weakness. (*Id.*). Dr. Niaz indicated that Bacon had an abnormal gait, lower lumbar trigger points, and a positive straight leg-raising test raising to ten degrees on the left and fifteen degrees on the right. (*Id.*). He further stated that Bacon had pain after sitting 30 minutes, standing 15 minutes, and walking 15 minutes. (*Id.*).

Dr. Niaz opined that Bacon could not lift over 10 pounds; could sit for four hours and stand/walk for two hours in an eight hour day; and needed to change positions every half hour for 15 minutes at a time. (*Id.*). Dr. Niaz noted that Bacon's level of pain was complicated by her obesity. (Tr. 509). Depression and anxiety also contributed to Bacon's symptoms and functional limitations. (*Id.*). But she was capable of a low stress job. (*Id.*). Finally, Dr. Niaz indicated that Bacon could be expected to be absent more than three times a month. (Tr. 510-11).

### 2. Dr. Venkataramana

Dr. Venkataramana completed a report at the request of the Social Security Administration on December 23, 2009. (Tr. 442-45). In his opinion, Dr. Venkataramana stated that Bacon could sit, stand, and walk for a limited time; lift and carry up to 25 pounds occasionally; and handle objects. (*Id.*).

### D. The Administrative Hearing

#### 1. Bacon's testimony

Bacon testified that she felt she could not get a job because she was in so much pain she could barely function in her daily life. (Tr. 42). She described a daily pain in her middle to lower back and left shoulder, and pain two or three times a week from her gluteal region down her leg. (Tr. 46-47). She reported that spinal injections brought her more pain, and medications reduced her pain from a 9/10 to a 6/10. (Tr. 44, 46).

9

Bacon estimated that she can walk about forty-five minutes, stand for fifteen minutes, sit for thirty minutes, lift five pounds, and requires assistance getting up and down stairs. (Tr. 62-64). Bacon stated that her father and fiancé handle most of the cooking, household chores, and grocery shopping, although she will occasionally dust and help with cooking if she is not in too much pain. (Tr. 64-65).

### 2. VE's Testimony

At the administrative hearing, the ALJ asked the vocational expert ("VE") to classify Bacon's past work. (Tr. 70-72). The VE testified that Bacon's work as a gas station cashier/stock person was unskilled and light as generally performed and medium as performed by Bacon; her work as a flagger was light and unskilled; her work as a school bus driver was medium and semi-skilled; and her work as a hostess was light and skilled. (Tr. 70-71).

The ALJ then asked the VE to consider a hypothetical individual with Bacon's vocational background and education who could perform light level work but not climb ladders, ropes, or scaffolds and only occasionally perform all other postural movements; who could not push and pull with the upper extremities; who could only frequently as opposed to constantly handle and finger; who could not be exposed to vibration, hazards, odors, dust, gases, or poor ventilation; and who could perform simple, unskilled work, not performed at a production pace or on an assembly line. (Tr. 71-72). The VE testified that such an individual could perform Bacon's past work as a gas station cashier as it is generally performed. (Tr. 72). The VE further testified that such an individual could perform other light work at an unskilled level such as an office helper, counter clerk, and pre-assembler for printed circuit boards. (Tr. 72-73). Finally, the VE identified sedentary, unskilled work for the hypothetical individual including addresser, order clerk for food and beverage, and taper for printed circuit boards. (Tr. 73).

When questioned by Bacon's counsel, the VE testified that the hypothetical individual would be precluded from the jobs identified if they needed to take unscheduled breaks up to 1 ½ hours per day, lie down for 4 or 5 hours, or miss more than one day a week. (Tr. 74). A sit/stand option at will would have minimal impact on the jobs so long as the employee was productive while sitting or standing. (Tr. 74).

### E.  The ALJ's Findings

On June 3, 2011, the ALJ issued an unfavorable decision finding that Bacon was not disabled. (Tr. 22-39). Her findings of fact and conclusions of law may be summarized as follows:

- Bacon has not engaged in substantial gainful activity since December 14, 2009, the application date. (Tr. 11).

- Bacon has the following severe impairments: obesity, depression, cervical degenerative disc disease, lumbar strain/sprain, and carpal tunnel syndrome untreated. (Tr. 11).

- Bacon does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. (Tr. 15).

- Bacon has the residual functional capacity to perform light work except with occasional postural activities, no climbing ropes, ladders, scaffolding, avoiding overhead work, handling, fingering, and feeling frequently as opposed to constantly, avoiding pushing and pulling with upper extremities, and avoiding concentrated exposure to vibration and hazards, and environmentally avoiding concentrated exposure to odors, dusts, gas, extreme temperatures, and poor ventilation, limited to simple, unskilled work, not at a production pace, meaning paid by the piece or working on an assembly line. (Tr. 17-18).

- Bacon is capable of performing past relevant work as cashier at gas station. In the alternative, Bacon is capable of making a successful adjustment to other work that exists in significant numbers in the national economy. (Tr. 19-21).

- Bacon has not been under a disability, as defined in the Social Security Act, since December 14, 2009. (Tr. 21).

## II.  STANDARD OF REVIEW

A reviewing court will reverse the ALJ's decision only if the ALJ did not apply the proper legal standards or if the decision was not supported by "substantial evidence" in the record. 42 U.S.C. § 405(g); *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992). Where the ALJ's

findings of fact are supported by substantial evidence, the court is bound by those findings even if it would have decided the case differently. *Fargnoli v. Massanari*, 247 F.3d 34, 38 (3d Cir. 2001). Evidence is considered "substantial" if it is less than a preponderance but more than a mere scintilla. *Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). In determining whether substantial evidence supports the ALJ's findings, the court may not undertake a *de novo* review of the decision, nor may it re-weigh the evidence of record. *Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986).

In Social Security cases, the substantial evidence standard applies to motions for summary judgment brought pursuant to Federal Rule of Civil Procedure 56(c). *See Woody v. Sec'y of the Dep't of Health & Human Servs.*, 859 F.2d 1156, 1159 (3d Cir. 1988).

## III. DISCUSSION

Bacon makes several arguments in support of her motion for summary judgment. First, according to Bacon, the ALJ should have given controlling weight to her treating physician's opinion and failed to explain why she did not. (D.I. 15 at 11-15). Second, the ALJ applied the wrong legal standard in determining Bacon's credibility and her negative credibility determination was not supported by substantial evidence. (*Id.* at 15-17). Third, the ALJ failed to adequately account for Bacon's obesity in formulating her residual functional capacity ("RFC"). (*Id.* at 17-18). Finally, the ALJ's hypothetical questions failed to adequately account for all of Bacon's credibly established limitations. (*Id.* at 18-19). Each of these arguments are addressed in turn.

### A. Weight of Treating Physician's Opinion

Bacon argues that the ALJ should have given controlling weight to Dr. Niaz's opinion, and failed to explain why she did not. (D.I. 15 at 11-15). If a treating physician's opinion on the nature and severity of a claimant's impairment is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record, it will be given controlling weight. 20 C.F.R. §404.1527. If a treating physician's opinion is not given controlling weight, the ALJ must provide her reasons. *Id.*

Bacon does not identify the particular opinion of Dr. Niaz that was not given controlling weight and would have changed the outcome of the ALJ's decision. In a letter dated April 2010, Dr. Niaz opined, with little explanation, that Bacon was a candidate for disability. (Tr. 486). That opinion, however, is not dispositive, because only the ALJ can make a disability determination. *Perry v. Astrue*, 515 F. Supp. 2d 453, 462 (D. Del. 2007); 20 C.F.R. § 416.927(d).

Dr. Niaz also opinioned that Bacon's impairments limited how long she could sit, stand, or walk. Specifically, Bacon's pain increased if she stood for more than 15 minutes or sat for more than 30 minutes, and that she could not walk or stand for more than two hours and sit for more than four hours in an eight hour day. (Tr. 486, 507). The ALJ gave several reasons why she did not find Dr. Niaz's opinions on Bacon's physical limitations wholly persuasive, which were supported by substantial evidence in the record. First, as the ALJ explained, the opinions were not substantiated by or consistent with other evidence in the record. (Tr. 19). Physical examinations conducted by Drs. Niaz, Dowling, Venkataramana, and Zhu generated pain complaints during range of motion testing, but Bacon's strength was 5/5, her sensation was intact, the straight leg-raising test was negative, and she had a coordinated gait without assistance. (Tr. 431, 435, 440, 443, 533-48, 671, 687). MRIs of the spine consistently showed only mild stenosis and minimal

13

disc protrusions in the lumbar spine and cervical spine, and no stenosis or disc protrusion in the thoracic spine. (Tr. 346, 499, 679-81). Second, Dr. Venkataramana, a spinal and neuro surgeon, opined that that Bacon could sit, stand, and walk for a limited time; lift and carry up to 25 pounds occasionally; and handle objects. (Tr. Tr. 442-45).

Nevertheless, the ALJ generally took into account the physical limitations opined by Dr. Niaz when determining Bacon's RFC. The ALJ's hypothetical to the VE included a limitation that the individual could not perform at a production pace or on an assembly line. The VE testified that a sit/stand option at will would have minimal impact on the jobs identified so long as the employee was productive while sitting or standing. (Tr. 74). The ALJ formulated an RFC to perform light work except with occasional postural activities, and avoiding overhead work, handling, and frequent fingering, and pushing and pulling with the upper extremities. (Tr. 19-20).

Finally, the ALJ's decision was consistent with Dr. Niaz's opinion that Bacon was capable of a low stress job. (*See* Tr. 509). Accordingly, the ALJ appropriately considered those portions of Dr. Niaz's opinions supported by substantial evidence, and gave adequate explanations for those portions of Dr. Niaz's opinions she did wholly adopt.

### B. Plaintiff's Credibility

Bacon argues that the ALJ's credibility determination applied the wrong legal standard and did not give sufficient weight to her testimony. (D.I. 15 at 15-17). A claimant's subjective complaints will not alone establish a disability. 20 C.F.R. § 416.929(a). Instead, the ALJ must first consider whether there are medical signs or laboratory findings which show that the claimant has a medical impairment that could reasonably be expected to produce the pain or other symptoms alleged. 20 C.F.R. § 416.929(b). Second, the ALJ must evaluate the intensity and persistence of the symptoms to determine the effect on the claimant's capacity to work. 20 C.F.R. § 416.929(c).

In doing so, the ALJ must consider all the applicable evidence, including objective medical evidence; the claimant's daily activities; the type, dosage, effectiveness, and side effects of medications; statements from the claimant and her physicians; and any treatment for the impairment. *Id.*

Here, the ALJ acknowledged the two-step process and concluded that while Bacon's impairments could reasonably be expected to cause the alleged symptoms, her statements concerning the intensity, persistence, and limiting effects of those symptoms were not credible to the extent they were inconsistent with the ALJ's RFC assessment. (Tr. 18-19). Bacon relies on the Seventh Circuit's opinion *Bjornson v. Astrue*, 671 F.3d 640 (7th Cir. 2012) which criticizes that same language as "boilerplate" that reverses the appropriate standard. (D.I. 15 at 16).

As an initial matter, *Bjornson* is not binding on this court. Nevertheless, the ALJ has not erred under the principles set forth in that case. The decision to reverse in *Bjornson* was not based on the ALJ's use of boilerplate language but, instead, on the ALJ's failure to "link[] the conclusory statements contained therein to evidence in the record." *Bjornson*, 671 F.3d at 644–45. The Seventh Circuit has since explained that "[i]f the ALJ has otherwise explained his conclusion adequately, the inclusion of this language can be harmless." *Filus v. Astrue*, 694 F.3d 863, 868 (7th Cir. 2012).

Here, the ALJ's generic language is linked to an adequate discussion of the evidence. (Tr. 19). First, the ALJ noted some evidence that raises questions as to Bacon's credibility, including:

- The inconsistency between Bacon's statements that she stopped working in 2003 because of problems with her back and lifting, and that she stopped working because of a pay dispute in connection with a promotion. (Tr. 18, Tr. 39, 455, 493).

- The fact that Bacon stopped working in 2003 because of allegedly debilitating pain, but did not file a disability claim until 2008. (Tr. 18). The ALJ noted that Bacon was involved in a motor vehicle accident in 2008, which exacerbated her symptoms. (*Id.*). But that does not explain why she was purportedly suffering from

15

debilitating pain the preceding five years but did not file a claim. In assessing Bacon's credibility, the ALJ is "entitled to place weight on the fact that Plaintiff waited five years after she began suffering allegedly disabling pain and limitations before she filed her disability claim." *Goodhand v. Colvin*, 2015 WL 1406068, at *8 (D. Del. Mar. 25, 2015).

- Bacon reported that she took care of her Aunt's kids three days a week. (Tr. 18). An ALJ may take note of instances where a claimant's complaints of pain are inconsistent with her own description of her daily activities in determining a claimant's credibility. *Hartranft v. Apfel*, 181 F.3d 358, 362 (3d Cir. 1999).

- Dr. Venkataramana recommended and scheduled a spinal fusion surgery because Bacon reported that chiropractic treatment, physical therapy, and medications did not help. (Tr. 494). But Bacon canceled the surgery, because the doctor purportedly gave her only a 30% chance of being able to walk afterwards. (Tr. 43-44). Not only is that risk not indicated in Dr. Venkataramana treatment notes, but he states instead that maximum medical improvement would be expected after six months. (Tr. 498).

- There are several doctors' recommendations that Bacon obtain physical therapy for her back pain, but no evidence that she did. She did obtain physical therapy for her neck pain but stopped short of the prescribed regime. A claimant's failure to receive medical treatment consistent with severity of claimed symptoms is highly relevant in evaluating credibility. *Klangwald v. Comm'r of Soc. Sec.*, 269 Fed. Appx. 202, 205 (3d Cir. 2008).

- Finally, Bacon was consistently advised to seek nutritional counseling and lose weight, because her obesity was an aggravating factor, but during treatment for her obesity, her conditions worsened because she was noncompliant. "[A]n ALJ may consider a claimant less credible if the individual fails to follow the prescribed treatment plan without good reasons." *Vega v. Comm'r of Soc. Sec.*, 358 F. App'x 372, 375 (3d Cir. 2009).

Second, the ALJ noted evidence that raised questions as to Dr. Niaz's opinions including:

- Dr. Niaz's treatment notes from January 2009 to August 2010 contain nothing more than a list diagnoses and medications. (Tr. 382-402). Thus, those diagnoses are not substantiated. A physician's conclusory opinions unsupported by medical evidence are not controlling. *Jones v. Sullivan*, 954 F.2d 125, 129 (3d Cir.1991).

- Dr. Niaz did not address whether Bacon's limitations in sitting or standing would entirely precluded her from work if she was allowed to change positions at will. (Tr. 19).

- Dr. Venkataramana, a neuro surgeon specialist, opined that Bacon could sit, stand, and walk for a limited amount of time and lift up to 25 pounds. (Tr. 19). The ALJ

16

>is entitled to "give more weight to the opinion of a specialist about medical issues related to his or her area of specialty." *See* § 404.1527(c)(5).

Thus, the ALJ reasonably concluded, based on substantial evidence, that the intensity, persistence, and limiting effects of Bacon's pain were not credible to the extent that it is inconsistent with her assessment of Bacon's RFC. Unlike *Bjornson*, the ALJ adequately addressed the contrary evidence and built a logical bridge supporting her credibility determination.

### C. Severity of Bacon's Obesity

Bacon claims that the ALJ failed to adequately account for her obesity in the RFC finding. (D.I. 15 at 17-18). The ALJ found that Bacon's obesity was a severe impairment, and further acknowledged that the combined effects of her obesity with her other impairments could be greater than when assessing the impairments separately. (Tr. 11, 15). The ALJ accounted for Bacon's limitations in formulating her RFC by avoiding climbing and overhead work, and limiting her to simple, unskilled light work not at production pace. (Tr. 17-18). Bacon has not alleged that her obesity caused any limitations beyond those identified by the ALJ.

To the extent Bacon is suggesting that a claimant with a severe impairment of obesity is not capable of light work, at a non-production pace, that is not supported by the record or the case law. The record shows that none of Bacon's past work involved sedentary jobs. Instead, she performed work at a light or medium level of exertion. (Tr. 71). In addition, the court has found in the past substantial evidence supporting an ALJ's decision that a claimant with a severe impairment of obesity was capable of light work. *See, e.g., Matthias v. Colvin*, 2015 WL 1191281, at *7 (D. Del. Mar. 13, 2015); *Brown v. Astrue*, 789 F. Supp. 2d 470, 482 (D. Del. 2011).

Finally, the ALJ's decision did not restrict Bacon to light work. The ALJ stated that if Bacon's ability to perform light work has been eroded by additional limitations, there are several sedentary jobs in the national economy for which she would be qualified. (*See* Tr. 21 identifying

17

three sedentary jobs). Accordingly, the court finds that the ALJ appropriately accounted for Bacon's physical limitations due to her severe impairment of obesity.

### D.  Hypothetical Questions

Finally, Bacon argues that to the extent the court agrees with the errors claimed above, the ALJ's hypothetical question failed to adequately account for all of Bacon's credibly established limitations. (D.I. 15 at 18-19). Because the court has rejected Bacon's previous arguments, the ALJ has not erred on those grounds.

Bacon also claims that the ALJ's hypothetical was deficient, because it did not adequately capture Bacon's moderate difficulties in social functioning and moderate difficulties in concentration, persistence, or pace. (*Id.*). Instead, the hypothetical individual was restricted to only "simple, unskilled work, not at a production pace." (*Id.*). According to Bacon, this was an error under the Third Circuit's decision in *Ramirez v. Barnhart*. (*Id.*).

In *Ramirez*, the Third Circuit held that a hypothetical failed to adequately capture the fact that the claimant "often" suffered in concentration, persistence, or pace by limiting the job to "simple one or two-step tasks." 372 F.3d 546, 554 (3d Cir. 2004). As the Third Circuit noted, "an individual with deficiencies in pace might be able to perform simple tasks, but not over an extended period of time." *Id.* Accordingly, a hypothetical question which provides that the individual "would not have a quota to fulfill" accounts for moderate difficulties in concentration, persistence, and pace. *Russo v. Astrue*, 421 F. App'x 184, 192 (3d Cir. 2011); *see also* McDonald v. Astrue, 293 Fed. App'x 941, 946 (3d Cir. 2008) (distinguishing *Ramirez* because a hypothetical adequately conveyed a claimant's "moderate limitations" in concentration, persistence and pace, when the individual was limited to "simple, routine tasks"). Here, the ALJ did not run afoul of *Ramirez*

18

because it limited the hypothetical to a non-production pace. Accordingly, the hypothetical did not fail to adequately capture all of Bacon's credibly established limitations.

## IV. CONCLUSION

For the foregoing reasons, (1) Bacon's motion for summary judgment (D.I. 14) is DENIED; and (2) the Commissioner's motion for summary judgment (D.I. 17) is GRANTED.

An appropriate order will be entered.

Dated: February 12, 2016

UNITED STATES DISTRICT JUDGE